AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the
Eastern District of Virginia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched* | ) |
| | ) |
| | ) |
| **Information associated w/ user ID BIG-GAME-kennels**<br>**that is stored at premises controlled by Facebook Inc.** | ) |
| | ) |

F I L E D

**FEB 2 1 2018**

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

Case No.  1:18-sw-0100

**UNDER SEAL**

Inc.

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ **Northern** _____ District of _____ **California** _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 USC 49 & 371, 7 USC 2156 | Conspiracy to engage in an animal fighting venture |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA Katherine Rumbaugh

_____
*Applicant's signature*

FBI Special Agent Michael M. Palian
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  2/21/18

_____ /s/
Michael S. Nachmanoff
United States Magistrate Judge
*Judge's signature*

City and state:  Alexandria, Virginia

Hon. Michael S. Nachmanoff, U.S. Magistrate Judge
*Printed name and title*

**ATTACHMENT A**

The Facebook account associated with the user ID **BIG-GAME-kennels,** stored at premises owned, maintained, controlled, or operated by social media service provider Facebook, Inc., at 1601 S. California Avenue in Palo Alto, California.

## ATTACHMENT B

To the extent that the following information is within the possession, custody, or control of Facebook, Inc., including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for the account of Facebook user ID **BIG-GAME-kennels**:

• All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

• All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

• All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them;

• All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification  numbers; groups and networks of which the user is a member, including the groups'  Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use ofFacebook applications;

• All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

• All "check ins" and other location information;

• All IP logs, including all records of the IP addresses that logged into the account;

• All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

• All information about the Facebook pages that the account is or was a "fan" of;

• All past and present lists of friends created by the account;

• All records of Facebook searches performed by the account;

• All information about the user's access and use of Facebook Marketplace;

- The length of service (including start date), the types of service utilized by the user, and the means and source of any payments associated with the service (including any credit card or bank account number);

- All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

- All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken;

- All cookie data and associate machines and accounts collected by Facebook for user's account to include, but not limited to, browser information if available and other pages and groups where the user (or the associated user) is the creator.

Law enforcement personnel will thereafter review all information and records received from Facebook, Inc. employees to determine the information to be seized by law enforcement personnel. The information to be seized consists of information that constitutes evidence of violations of 7 U.S.C. § 2156 and 18 U.S.C. §§ 49(a) and 371, and/or relates to dog-fighting ventures; individuals or groups who engage in, sponsor, or attend dog fights; individuals or groups who breed dogs for the purpose of dog-fighting; and/or the identity of the person(s) who created and/or used the account.

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

```
FEB 2 1 2018
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA
```

IN THE MATTER OF THE SEARCH OF  )    UNDER SEAL
AN ACCOUNT AT FACEBOOK INC.  )
(THE TARGET ACCOUNT)  )    Case No. 1:18-SW-100
  )
  )

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Michael Palian, after being duly sworn, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI), where I have

been employed since 2003.  As an FBI special agent, I am authorized to investigate crimes

involving violations of federal law.  I have an MS and PhD in bio-organic chemistry and have

received training and gained experience in a variety of criminal laws and procedures that include

health care fraud, drug distribution, animal fighting, and financial crimes. I have previously

worked with the U.S. Department of Agriculture's Office of the Inspector General on another dog

fighting investigation, although they have not been involved with this case.

2.      I make this affidavit in support of four applications under Rule 41 of the Federal

Rules of Criminal Procedure, including one under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and

2703(c)(1)(A), to search to following:

    a.      SUBJECT PROPERTY #1: The premises known as 2807 Low Ground Road, Emporia, Virginia 23847, which is listed in Greensville County property records as Parcel 36-46D;

    b.      SUBJECT PROPERTY #2: The wooded area and dog yard found on Greensville County Parcel 36-46, which borders Subject Property #1 to the south and west;

    c.      The TARGET ACCOUNT: A Facebook account associated with Facebook user ID BIG-GAME-kennels, under the name of Big Game Kennels, stored at premises owned, maintained, controlled, or operated by social media service provider Facebook, Inc. at 1601 S. California Avenue, in Palo Alto, California; and,

    d.      The person of JEFFERY SCOTT, as well as the area within his control and any electronic devices.

3.      Each place, account, or person to be searched is described further in the Attachment A appended to the corresponding search warrant application. Likewise, the things to be searched for are described further in the Attachment B appended to the corresponding search warrant application.

4.      The facts and information contained in this affidavit are based upon my training and experience, participation in this and other investigations, personal knowledge, and observations during the course of this investigation, as well as the observations of other federal agents and individuals involved in this investigation. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

2

5.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that evidence, fruits, or instrumentalities of conspiracy to engage in an animal fighting venture, in violation of 7 U.S.C. § 2156 and 18 U.S.C. §§ 49(a) & 371, are in the TARGET PREMISES, TARGET VEHICLE, and on SCOTT's person or in his control.

## BACKGROUND ON DOG FIGHTING

6.     From my training and experience with the FBI, as well as through my work with the USDA OIG, I know the following:

7.     In the United States, dog fighting ventures almost always involve "pit bull"-type dogs, which dog fighters prefer for their compact muscular build, short coat, and the aggression that some display toward other dogs.  Generally, in a dog fight, two dogs are knowingly released by their handlers in a controlled environment to attack each other and fight.  The fight ends when one dog stops fighting and withdraws, when a handler pulls his dog out and forfeits the match, or when one or both dogs die.

8.     Generally, dog fighters fight dogs with a goal of obtaining "Champion" or "Grand Champion" status for their dogs, which is achieved by winning three or five fights, respectively.  They maintain contact with other dog fighters around the country, and can generate substantial income from gambling on dog fights and from the sale and breeding of fighting animals.  Thus, dog fighters select the strongest, most capable fighting dogs and selectively breed, sell, and fight only those dogs that display particular traits, which include:

      a.     "gameness" or aggressiveness and propensity to fight other dogs;

      b.     a willingness to continue fighting another dog despite traumatic and/or mortal injury; and,

3

     c.     cardiovascular endurance to continue fighting for long periods of time and through fatigue and injury.

     d.     Dogs displaying these attributes are often bred with other dogs displaying similar traits to enhance the bloodline of these dogs for fighting purposes. Dog fighters such as the individuals described in this affidavit generally keep such dogs solely for fighting purposes.

9.     Handlers involved in dog fighting ventures train and condition their dogs. Dogs trained and conditioned for fighting are almost always housed separately from other dogs — in pens, cages, or on chains — so that they will not hurt or kill other dogs when the handler is absent. Heavy chains affixed to a pole — so that the dogs can move in a circle around the pole, but no further — are often used when restraining dogs to develop neck strength in dogs used for fighting purposes.

10.     As a chained dog moves around the pole, the heavy chain drags on the ground, wearing away the ground and leaving a tell-tale brown circle in the dog yard for each dog. Aerial imagery of these dog yards shows a very distinct pattern of dirt circles, one for each dog in the yard, and is further evidence of a dog fighting operation.

11.     It is a common practice for those involved in training and exhibiting fighting dogs to possess several dogs at one time, for several reasons. First, dog fighters generally maintain a stock of dogs of different weights and both sexes because in dog fights, dogs are matched against other dogs to within a pound of the same weight against dogs of the same sex. Maintaining a stock of several dogs thus increases the odds of owning a dog whose weight meets the requirements for a match being solicited by an opponent. Second, dog fighters also generally maintain multiple

4

dogs in order to selectively breed, sell, and fight dogs displaying certain traits or to otherwise advance a particular dog fighting bloodline.

12.     Further, dog fighters generally must possess an inventory of dogs because dogs often die or sustain grievous injuries during fights.  Possessing multiple dogs also increases the prospects of owning a dog who will become a Champion or Grand Champion.  Dog fighters also routinely test and evaluate their dogs to determine those that exhibit aggressive behavior, which is a more desirable trait, including against their own dogs.

13.     Generally, handlers often kill dogs that lose fights or fail to show "gameness."  It is not uncommon for dogs that lose matches to be killed in cruel, torturous, and inhumane ways as punishment.

14.     Dog fights typically involve consistent practices leading up to and during the fight. Fighting dog owners or handlers enter into a verbal or written contract with their opponent several weeks before the dog fight, often referred to as a "match," "fight," or "show."  The owners or handlers agree upon: (1) the sex and set weight of the dogs at the time of the fight; (2) the geographic area in which the fight will occur (the exact location of which is often a guarded secret until shortly before the fight); (3) a referee; (4) the payment of "forfeit" money that is lost if one participant pulls out of the match or if a participant's dog does not arrive at the agreed-upon weight; and (5) monetary wagers placed by the respective fighters.

15.     It can be challenging for dog fighters to find an opponent with a dog of the same weight and sex who is looking to fight that dog at the same time of year, and for a wager that is mutually agreeable to both parties.  For that reason, dog fighters rely heavily on each other and on extensive networks of contacts to find an opponent who has a dog of the same weight and sex and

5

who is looking to fight that dog at the same time of the year. The practice is known as "calling out a weight." Dog fighters often "call out a weight" to known dog fighters in several states, to increase their odds of finding a match. "Calling out a weight" is done by telephone, text message, e-mail, or other electronic communication. It is an integral practice without which many dog fights would not occur.

16.     Once a dog fighter locates an opponent and agrees upon terms, the match is "hooked," or set up. The dog then typically undergoes a conditioning process dog handlers refer to as a "keep." A "keep" is typically conducted for six to eight weeks before the scheduled match and involves a training program including: treadmills used to run and exercise the dogs away from public view; weight pulls used to increase the dog's strength and stamina; the use of devices such as "spring poles" and "flirt poles" to build jaw strength and increase aggression; and the administration of drugs, vitamins, and other medicine. Some of the drugs used, illegal and legal, include steroids to build muscle mass and aggression. Dogs matched for future fights are expected to achieve their established target weight by the scheduled match, much like in human boxing matches, requiring close attention to a dog's routine. Training can take place at a dog fighter's "yard" or indoors away from public view, often in a basement.

17.     Although dogs used for fighting are often housed outside, as the match date approaches, a dog in a keep may be housed indoors or near the owner/handler for several reasons. One reason is to prevent the dog from becoming sick or injured by other dogs before the match, which could cause the dog to forfeit and the owner to pay a forfeit fee. Another reason is that dogs in a keep require constant exercise and monitoring, which is easier when the dog is in close vicinity rather than off-site or outside. Dogs intended for fighting purposes are also often housed inside

6

residences if they are injured, ill, pregnant, weaning, or if a dog fighter does not have another location to keep them or wants to keep them out of view.

18.     Some dog fighters are selective about who they will sell fighting dogs to, because the success of that dog in the fighting ring will reflect on the seller whose bloodline is represented by the dog. A dog that produces multiple offspring that go on to be "Champions" (*i.e.*, winning three or more dog fights) is bestowed the "Register of Merit" or "R.O.M." title. This provides incentive to the seller to sell dogs to capable dog fighters, with the intention that the dogs will be fought.

19.     It is common for those operating dog fighting ventures to maintain pedigrees, books, records, ledgers, and journals relating to the purchase, transportation, sale, breeding, and training of fighting dogs. These materials occur in both hard and electronic copy. Dog fighters often maintain information regarding dog fighting activities in order to stay current with the dog fighting community. "Underground" dog fighting publications similar to magazines are routinely published and distributed to readers through periodic subscriptions, which describe and report on recent fight details and past results from around the country using coded language. They also describe various "kennels" or dog breeders who raise dogs for animal fighting purposes. In addition, there are online versions of published magazines that serve the same purpose, as well as websites on which dog fighters post pedigrees to demonstrate the fighting lineage of their dogs. Dog fighters also maintain detailed ledgers and journals that specifically depict how certain dogs performed during a particular fight, together with the duration and outcome of fights.

20.     Dog fighters today tend to communicate via email, text messages, or website chat rooms dedicated to "game dogs." Dog fighters routinely hook matches and exchange documents,

tips, photographs, or videos relating to dog fighting activities via electronic means. Dog fighters exchange videos, for example, to demonstrate the strength and gameness of their dogs.

## PROBABLE CAUSE

21.     In the course of this investigation, my FBI colleagues spoke to a confidential source ("CI-1") who recently entered a guilty plea in federal court to a drug trafficking offense. As part of his attempts to earn a sentence reduction, CI-1 provided information to investigators. Without being specifically asked about dog fighting, CI-1 said that an individual that he knew by the nickname "Head" is involved in pit bull dog fighting, with at least two other individuals. CI-1 identified a photo of Jeffery Scott as the individual that he knew as "Head."

22.     CI-1 advised that Scott has been involved in dog fighting for approximately fifteen to twenty years. CI-1 further reported that, to his knowledge, "Head" and his co-conspirators have approximately 60 pit bull dogs, which they maintain at SUBJECT PROPERTIES #1 and #2. CI-1 reported that in 2016, he met "Head" at the residence on SUBJECT PROPERTY #1 for a drug transaction; while inside the residence, CI-1 observed a treadmill, which he believed was used to train the dogs for fighting.

23.     The information provided by CI-1 was corroborated by information provided to a local officer on an FBI drug task force by a confidential informant ("CI-2"), who was not known to CI-1. In and around the summer of 2017, CI-2 said that dog-fighting activities were being conducted at SUBJECT PROPERTIES #1 and #2, which are located within Greensville County in the Eastern District of Virginia.

      a.     CI-2 has been providing information to law enforcement for approximately twenty years, the most recent thirteen of which was to the same detective. Although CI-2

has been addicted to drugs for most of, if not the entire period of time he has served as an informant, much of the information CI-2 provided has been corroborated, and with one exception, none of the information has been found to be incorrect.

b.     The one piece of incorrect information that CI-2 has provided is that in and around summer 2017, CI-2 reported that a subject of investigation had left town when, in fact, the subject had not moved away. A few days later, however, CI-2 volunteered that the information he provided was correct, and the subject had not left town. Law enforcement believes, given CI-2's record over approximately two decades, the incorrect information was the result of mistake, not the intent to deceive.

24.     CI-2 advised law enforcement that the SUBJECT PROPERTIES were used by an individual with the nickname "Head" as the sites of dog fights and training on an ongoing basis. CI-2 advised that dog fights have been held on SUBJECT PROPERTY #2, which is the wooded area behind the residence on SUBJECT PROPERTY #1. CI-2 further advised that the bodies of dead dogs were thrown from pickup trucks into fields and into the wooded area on SUBJECT PROPERTY #2 (which borders SUBJECT PROPERTY #1 to the south and west) after the fights. CI-2 identified Jeffery Scott, the main subject of this investigation, by the nickname "Head."

25.     Greensville County property tax records for 2017 reveal that SUBJECT PROPERTY #1 is owned by Ralph and Lelia Scott, whom law enforcement believes are related to Jeffery Scott. Jeffrey Scott has listed this as his home address in four insurance claims ranging from 1993-2004. Further, both CI-1 and CI-2 advised law enforcement that Scott lives at the residence at SUBJECT PROPERTY #1. Greensville County property tax records indicate that SUBJECT PROPERTY #2 is owned by Lewis Scott.

26.    On or about January 9, 2018, I conducted physical surveillance at and around SUBJECT PROPERTIES #1 and #2. During that surveillance, I was able to view the backyard of the property from the street. I was able to observe at least sixteen dog houses in the back yard of the property, which appeared to be in poor condition. Based on my training and experience, I believe this volume of dog houses to be consistent with a dog fighter's yard.

27.    I have also reviewed satellite imagery from Google Earth of the Subject Premises spanning the past nine years. The first image I reviewed was from October 2008, which showed no signs of dirt ground circles associated with a dog fighting yard. However, starting in February 2013 and continuing until the most recent imagery in April 2017, it is apparent that, over time, more and more dirt ground circles have formed. In the April 2017 imagery, approximately thirty-two dirt ground circles are visible through satellite imagery:



Based on my training and experience, and as described above, I know these types of dirt ground circles to be associated with dog fighting and attendant activities.

28.     The information gleaned from satellite imagery was confirmed in and around January 2018 through aerial surveillance, by which investigators were able to observe approximately fifteen pitbull-type dogs in the backyard of the property, with additional dog houses in the wooded area behind the residence.  During separate surveillance, law enforcement observed an individual fitting the physical description of Jeffery Scott, as compared to DMV and Facebook records, working in the dog yard at the Subject Premises.

29.     A comparison of DMV and Facebook records also leads me to believe that Scott is the owner of "Big Game Kennels" (hereafter, "BGK"), an entity which holds itself out on its public Facebook page (the TARGET ACCOUNT) as a "Local Virginia breeding company established in 1995…Known for some of the rarest breeds of pitbulls in the region…serious inquiries only." As stated above, pitbulls are the breed of choice for dog fighting.  One of the main photos on the TARGET ACCOUNT depicts an individual standing by a pickup truck full of concrete dog bowls. I believe the individual in this photo to be Jeffery Scott, based on a comparison with DMV records.

30.     On or about January 29, 2018, I visited "**abpt.online-pedigrees.com**," a website on which dog fighters post pedigrees to demonstrate the fighting lineage of their dogs, as described in Paragraph 19, above.  On this website, pedigrees are searchable by a variety of parameters and are routinely marked with codes to signify dogs' fighting results, such as "1XW," "CH.," and "GR. CH.," which are notations that dog fighters commonly use to document the dog's fighting history, and signify a one-time dog-fight winner, a champion, and grand champion, respectively.  On that site, I found certificates for five of BGK's or other associated dogs listed on the BGK Facebook

11

page, dating from December of 2014 to August of 2017. Some of those certificates contain notes in the lineage such as "1XW," "2XW," and "GR. CH." Based on my training and experience, I know pedigree certificates are important to dog fighters to document a dog's lineage, which is necessary for the profitable sale of puppies, as descendants of champion and grand champion dogs will command a significantly higher price than non-pedigreed puppies.

31.     On the TARGET ACCOUNT, I reviewed public visible postings and photos associated with BGK. Several postings advertise the sale of pit bull puppies; for example,

     a.     A post dated on or about January 18, 2017, on the TARGET ACCOUNT stated "Hold YARD FOR SALE!! COME CHECK IT OUT!!" In the comments section, the BGK account replied to a question about price by stating "500." The TARGET ACCOUNT also posted, in the comments section to the original post, links to pedigree certificates in which the lineage of the dogs for sale has the terms "GR. CH." and "1X." Based on my training and experience investigating dog-fighting ventures, $500 is consistent with the price of one pitbull puppy of this lineage.

     b.     A post dated on or about December 28, 2014, on the TARGET ACCOUNT stated "For SALE" along with a picture of a pit bull puppies, a link to a pedigree certificate (which was not accessible) and a picture of a pedigree certificate, which I believe was the pedigree certificate of the puppies pictured. This certificate also denotes "3XW," "2XW," and "7XW" (three-time-, two-time-, and seven-time-winners) in the puppies' lineage. A screen capture of this pedigree is shown below:



c. A post dated on or about July, 30, 2013, on the TARGET ACCOUNT showed a picture of some puppies in a kennel. One of the comments on the post asked "how much?" to which BGK replied "200." I believe this means that BGK was willing to sell each puppy for $200.

32. Many of the links to pedigrees that the TARGET ACCOUNT has posted are for dogs whose names' begin with "Scott's"; for example, the picture above depicts a pedigree for a pit bull puppy whose mother's name is "Scott's Shell Bell." Based on my training and experience, I know that it is common for breeders of dogs — particularly of dogs intended for fighting ventures — to include their names as part of their dogs' names. In light of that, and in light of the foregoing facts, I believe Jeffery Scott is the breeder of many of the pit bulls featured on the TARGET ACCOUNT.

13

33.     Furthermore, the publicly visible photos on the BGK account depict numerous other photos of pit bull-type dogs, many if not all of which are restrained with very heavy-looking chains, which is indicative of dog fighting activities, as described above.

34.     On or about February 6 and 7, 2018, a law enforcement employee acting in an undercover capacity (the "UCE") contacted BGK through the TARGET ACCOUNT. The undercover inquired if BGK still had pit bull puppies to sell. The TARGET ACCOUNT replied to the UCE that it did have puppies, stated the puppies were $400 each, and provided a link to a pedigree certificate for the dogs. The TARGET ACCOUNT also provided the phone number 678-538-5490 for the UCE to contact the user about the puppies. Based on FBI and insurance records I have reviewed, I know this to be a Verizon Wireless phone number used by Jeffery Scott. The BGK representative using the TARGET ACCOUNT identified himself to the UCE as "Head," the same alias by which CI-1 and CI-2 knew Jeffery Scott.

     a.     In and around early December 2016, law enforcement executed two search warrants in connection with an investigation into an individual named Rashourn Niles, also suspected to be involved in dog-fighting ventures. Upon executing the warrants, law enforcement found the same unusual type of concrete dog bowls depicted in the TARGET ACCOUNT photo, along with nineteen pitbulls with scarring consistent with organized dog fighting and numerous items of dog fighting paraphernalia.

     b.     Phone records associated with Niles show that he was in telephonic contact with Scott, who used the number 678-538-5490, at least twice in April 2017.

35.     On or about February 8, 2018, the UCE spoke to Scott over the phone. Scott advised the UCE he "would be able to compete with anything" with the puppies that BGK would sell.

14

Based on my training and experience and knowledge of this investigation, I believe Scott meant these dogs could compete with any other dog in a fight. Further, the user of the TARGET ACCOUNT (which I believe to be Scott), sent the UCE a link to a pedigree for the puppies for the UCE to review. The pedigree showed that the puppies maternal and paternal grandfathers were both "1XW," *i.e.*, those dogs were one-time winners in a dog fight.

### ELECTRONIC DEVICES AND STORAGE MEDIA

36. For the reasons stated in this affidavit, this search warrant application seeks authority to search the SUBJECT PROPERTIES, TARGET ACCOUNT, and the person of SCOTT as well as any electronics on his person or in his control for evidence relating to a conspiracy to engage in an animal fighting venture, in whatever form and whatever means they may have been created or stored, including any form of computer storage. Among other things, based on my review of the relevant evidence, including information described above, I believe that SCOTT has used a cell phone, computers, or tablets to transmit communications from the SUBJECT PROPERTIES and through the TARGET ACCOUNT in furtherance of the aforementioned conspiracy. The warrants applied for would therefore authorize the seizure of computers, tablets, wireless telephones, and other electronic devices or storage media, and the copying of electronically stored information, all under Rule 41(e)(2)(B).

37. If computers, tablets, wireless telephones, or other electronic devices or storage media are found at the SUBJECT PROPERTIES, or on SCOTT's person or within his control, there is probable cause to believe records covered by these warrants will be stored on those devices, for at least the following reasons:

15

a.      Based on my knowledge, training, and experience, I know that wireless telephones have capabilities that allow them to serve as: telephones, digital cameras, portable media players, GPS navigation devices, and personal digital assistants. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

b.      Further, based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensic tools.

c.      Additionally, based on my knowledge, training, and experience, I know that files or remnants of such files can be recovered months or even years after they have been downloaded onto an electronic device, deleted, or viewed via the Internet. Electronic files downloaded to a computer, tablet, wireless telephone, or other electronic devices or storage media can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on an electronic device, the data contained in the file does not actually disappear; rather, that data remains on the electronic device until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space — that is, in space on the device that is not currently being used by an active file-for long periods of time before they are overwritten. In addition, for example, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

16

d.      Wholly apart from user-generated files, electronic storage media — in particular, computers' internal hard drives — contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. Electronic device users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

e.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

38.      As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrants, but also for forensic evidence that establishes how computers, tablets, wireless telephones, or other electronic devices or storage media were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any electronic devices or storage media at the SUBJECT PROPERTIES or on SCOTT's person or within his control because:

a.      Data on computers, tablets, wireless telephones, or other electronic devices or storage media can provide evidence of a file that was once on the computer, tablets, wireless telephones, or other electronic devices or storage media but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on

17

the storage medium that show what tasks and processes were recently active. Web browsers, email programs, and chat programs store configuration information on the computer or other electronic devices or storage media that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times a computer was in use. Electronic device file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.     As explained herein, information stored within a computer, tablets, wireless telephones, and other electronic devices or storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element of a crime, or, alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or other electronic devices or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, Internet history, and anti-virus, spyware, and malware detection programs) can indicate durations, Internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer, tablet, wireless telephone, or other electronic devices or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer, tablet, wireless

18

telephone, or other electronic devices or storage media was remotely accessed, thus inculpating ·or exculpating its owner.

c.     Further, computer, tablet, wireless telephone, and other electronic devices or storage media activity can indicate how and when the device was accessed or used. For example, as described herein, computers, tablets, wireless telephones, or other electronic devices or storage media typically contain capabilities that log a variety of information, such as user account session times and durations, activity associated with user accounts, electronic storage media that connected with the computer, tablet, or wireless telephone, and the IP addresses through which the computer, tablet, wireless telephone, or other device accessed networks and the Internet. Such information allows investigators to understand the chronological context of computer, tablet, wireless telephone, or other electronic devices or storage media access, use, and events relating to the crime under investigation.

d.     Additionally, some information stored within a computer, tablet, wireless telephone, or other electronic devices or storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a device may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the

19

user of the computer, tablet, wireless telephone, or other electronic devices or storage media. Lastly, information stored within a computer, tablet, wireless telephone, or other electronic devices or storage media may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information within a computer, tablet, wireless telephone, or other electronic devices or storage media may indicate the owner's motive and intent to commit a crime (e.g., Internet searches indicating criminal planning), or consciousness of guilt (e.g., running a. "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

e.    A person with appropriate familiarity with how computers, tablets, wireless telephones, or other electronic devices or storage media work can, after examining this forensic evidence in its proper context, draw conclusions about how computers, tablets, wireless telephones, and other electronic devices or storage media were used, the purpose of their use, who used them, and when.

f.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a computer, tablet, wireless telephone, or other electronic devices or storage media that is necessary to draw an accurate conclusion is a dynamic process.   While it is possible to specify in advance the records to be sought, electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer, tablet, wireless telephone, or other electronic devices or storage media is evidence may depend on other information stored on the device and the application of knowledge· about how a particular

20

device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrants.

g.      Further, in finding evidence of how a computer, tablet, wireless telephone, or other electronic devices or storage media was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a computer, tablet, wireless telephone, or other electronic devices or storage media. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

39.      In most cases, a thorough search of a premises for information that might be stored on computers, tablets, wireless telephones, or other electronic devices or storage media often requires the seizure of the physical computer, tablet, wireless telephone, or other electronic devices or storage media and later off-site review consistent with the warrants. In lieu of removing computers, tablets, wireless telephones, or other electronic devices or storage media from the premises, it is sometimes possible to make an image copy of the computer, tablet, wireless telephone, or other electronic devices or storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer, tablet, wireless telephone, or other electronic devices or storage media's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the computer, tablet, wireless telephone, or other electronic device or storage medium, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

21

a.      *The time required for an examination.* As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer, tablet, wireless telephone, or other electronic devices or storage media has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. Because the warrants call for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine computers, tablets, wireless telephones, and other electronic devices or storage media to obtain evidence. Computers, tablets, wireless telephones, and other electronic devices or storage media can store a large volume of information. Reviewing that information for things described in the warrants can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.      *Technical requirements.* Electronic devices can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on site. However, taking the computers, tablets, wireless telephones, or other electronic devices or storage media off-site and reviewing them in a controlled environment will allow their examination with the proper tools and knowledge.

      c.     *Variety of forms of electronic devices.* As described above, records sought under these warrants could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

40.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrants I am applying for would permit seizing, imaging, or otherwise copying computers, tablets, wireless telephones, and other electronic devices or storage media that reasonably appear to contain some or all of the evidence described in the warrants, and would authorize a later review of the computer, tablets, wireless telephones, or other electronic devices or storage media pursuant to the warrants. The later review may require techniques, including but not limited to computer-assisted scans of the entire computer, tablet, wireless telephone, or. other electronic devices or storage media, that might expose many parts of the computer hard drive, tablet, wireless telephone, or other electronic devices or storage media to human inspection in order to determine whether it is evidence described by the warrant.

## LOCKED DEVICES WITH TOUCH ID

41.     This search warrant also seeks authority for law enforcement to press the fingers (including thumbs) of SCOTT to the Touch ID sensor of any Apple brand device(s), such as an iPhone or iPad, found at the SUBJECT PROPERTIES or on SCOTT's person or within his control, for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by these warrants.

42.     I know from my training and experience, as well as from information found in publicly available materials including those published by Apple, that some models of Apple devices such as iPhones and iPads offer their users the ability to unlock the device via the use of a

23

fingerprint or thumbprint (collectively, "fingerprint") in lieu of a numeric or alphanumeric passcode or password. This feature of Apple products is called Touch ID. If a user enables Touch ID on a given Apple device, he or she can register up to five fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor, which is found in the round button ( often referred to as the "home" button) found at the bottom center of the front of the device. In my training and experience, users of Apple devices that offer Touch ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password; as well as a more secure way to protect the device's contents. Upon information and belief, in some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode or password must be used instead. These circumstances include: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days. Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; and (3) five unsuccessful attempts to unlock the device via Touch ID are made.

43.     The passcode or password that would unlock any Apply device(s) found during the search of the SUBJECT PROPERTIES or SCOTT's person is not known to law enforcement. Thus, it will likely be necessary to press the finger(s) of the user(s) of the Apple device(s) found during these searches to the device's Touch ID sensor in an attempt to unlock the device for the

24

purpose of executing the searches authorized · by these warrants. Attempting to unlock the relevant Apple device( s) via Touch ID with the use of the fingerprints of the user(s) is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the searches authorized by these warrants.

44.     Although I do not know which of a given user's 10 fingerprints is capable of unlocking a particular device, based on my training and experience I know that it is common for a user to unlock a Touch ID-enabled Apple device via the fingerprints on thumbs or index fingers. In the event that law enforcement is unable to unlock the Apple device(s) found at the SUBJECT PROPERTIES, or on SCOTT's person or within his control, as described above within the five attempts permitted by Touch ID, this will simply result in the device requiring the entry of a password or passcode before it can be unlocked.

45.     Due to the foregoing, I request that the Court authorize law enforcement to press the fingers (including thumbs) of SCOTT to the Touch ID sensor of any Apple brand device(s), such as an iPhone or iPad, found at the SUBJECT PROPERTIES, or on SCOTT's person or within his control, for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by these warrants.

## INFORMATION ABOUT FACEBOOK

46.     Facebook, Inc., is a social media company with offices at 1601 S. California Avenue, in Palo Alto, California, and owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the

25

general public. Each Facebook user account has a unique Facebook user identification number (UID).

47.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

48.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number (GID) to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

49.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these

privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

50. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

51. Facebook has a Photos application, where users can upload an unlimited number of albums and photos and videos. Another feature of the Photos application is the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

52. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information.

27

Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

53.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

54.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a

28

personalized message can be attached to each gift.  Facebook users can also send each other

"pokes," which are free and simply result in a notification to the recipient that he or she has been

"poked" by the sender.  Facebook also has a Marketplace feature, which allows users to post free

classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

55.     In addition to the applications described above, Facebook also provides its users

with access to thousands of other applications on the Facebook platform.  When a Facebook user

accesses or uses one of these applications, an update about that the user's access or use of that

application may appear on the user's profile page.

56.     Some Facebook pages are affiliated with groups of users, rather than one individual

user.  Membership in the group is monitored and regulated by the administrator or head of the

group, who can invite new members and reject or accept requests by users to enter.  Facebook can

identify all users who are currently registered to a particular group and can identify the

administrator and/or creator of the group.  Facebook uses the term "Group Contact Info" to

describe the contact information for the group's creator and/or administrator, as well as a PDF of

the current status of the group profile page.

57.     Facebook uses the term "Neoprint" to describe an expanded view of a given user

profile.  The "Neoprint" for a given user can include the following information from the user's

profile:  profile contact information; News Feed information; status updates; links to videos,

photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends'

Facebook user identification  numbers; groups and networks of which the user is a member,

including the groups' Facebook group identification  numbers; future and past event postings;

rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

58.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

59.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).   In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.   Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

60.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook, Inc. to disclose to the government copies of the records and other information (including the content of communications) particularly described in Paragraph A of Attachment A. Upon receipt of the information described in Paragraph A of Attachment A, government-

authorized persons will review that information to locate the items described in Section B of Attachment A.

61.     I am trained and experienced in identifying communications relevant to the crimes under investigation, but personnel of Facebook, Inc. are not. I also know that the manner in which the data is preserved and analyzed may be critical to the successful prosecution of any case based upon this evidence. Computer Forensic Examiners are trained to handle digital evidence, but employees of Facebook, Inc. are not. It would be inappropriate and impractical, however, for federal agents to search the vast computer network of Facebook, Inc. for the relevant account and then to analyze the contents of that account on the premises of those corporations. Further, the impact on the businesses of that corporation would be severe.

62.     Accordingly, executing a warrant to search an e-mail account at Facebook, Inc. requires an approach similar to the standard approach for executing a warrant to search papers stored in a file cabinet. Searching the subject e-mail account in this case for evidence of the target crime will require that agents cursorily inspect all e-mails produced by Facebook, Inc. in order to ascertain which contain evidence of that crime, just as it necessary for agents executing a warrant to search a filing cabinet to conduct a preliminary inspection of its entire contents in order to determine the documents which fall within the scope of the warrant. In addition, keyword searches alone are inadequate to identify all of the information subject to seizure, because keywords search text, but many common electronic mail, database and spreadsheet applications files (which files may have been attached to electronic mail) do not store data as searchable text.

63.     In order to facilitate seizure by law enforcement of the records and information sought from Facebook, Inc. through this affidavit and application with a minimum of interference

with the business activities of Facebook, Inc. to protect the rights of the subject of the investigation, and to effectively pursue this investigation, this application seeks the issuance of a warrant that would permit employees of Facebook, Inc. to assist agents in the execution of this warrant, in accordance with the procedures described in Attachment A to the warrant, which is hereby incorporated into this Affidavit. In accordance with these procedures:

    a) The search warrant for the Facebook, Inc., account will be presented to Facebook, Inc. personnel, who will be directed to isolate the account of Facebook user ID BIG-GAME-kennels, under the name of Big Game Kennels.

    b) In order to minimize any disruption of computer service to innocent third parties, Facebook, Inc. employees and/or law enforcement personnel trained in the operation of computers will create and provide to law enforcement personnel in electronic form an exact duplicate of the identified account and all information stored in that account.

    (c) Law enforcement personnel will thereafter review all information and records received from Facebook, Inc. employees to determine the information to be seized by law enforcement personnel. The information to be seized consists of information that constitutes evidence of violations of 7 U.S.C. § 2156, 18 U.S.C. §§ 49(a) and 371; individuals or groups who engage in dog fighting, breeding dogs for fighting, caring for fighting dogs, or any other activity related to a dog fighting venture; and/or the identity of the person(s) who created and/or used the account.

64. I am advised that this Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

65. I am advised that, pursuant to 18 U.S.C. § 2703(a), a Court with jurisdiction over the offense that is under investigation has authority to issue a warrant to compel disclosure of stored content and records and other information pertaining to a customer or subscriber of an electronic communication service or remote computer service from an internet service provider

("ISP") - - including an ISP located physically in another judicial district. Accordingly, this Court has the authority to issue warrants to Facebook, Inc. for stored content and records and other information pertaining to their subscribers even though Facebook, Inc. is located in California.

## CONCLUSION

66.     Based on the foregoing, I submit that probable cause exists that the evidence, fruits, or instrumentalities of conspiracy to engage in an animal fighting venture, in violation of 18 U.S.C. §§ 49(a) and 371, and 7 U.S.C. § 2156, are located at the SUBJECT PROPERTIES, in the TARGET ACCOUNT, and on the person of JEFFERY SCOTT as well as the area within his control and any electronic devices.

Respectfully submitted,

Michael M. Palian
Special Agent, FBI

Subscribed to and sworn before me on this 21st day of February, 2018.

/s/

Michael S. Nachmanoff
United States Magistrate Judge

The Hon. Michael S. Nachmanoff
United States Magistrate Judge

## ATTACHMENT A

The Facebook account associated with the user ID **BIG-GAME-kennels,** stored at premises owned, maintained, controlled, or operated by social media service provider Facebook, Inc., at 1601 S. California Avenue in Palo Alto, California.

**ATTACHMENT B**

To the extent that the following information is within the possession, custody, or control of Facebook, Inc., including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for the account of Facebook user ID **BIG-GAME-kennels**:

- All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

- All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

- All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them;

- All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification  numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use ofFacebook applications;

- All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

- All "check ins" and other location information;

- All IP logs, including all records of the IP addresses that logged into the account;

- All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

- All information about the Facebook pages that the account is or was a "fan" of;

- All past and present lists of friends created by the account;

- All records of Facebook searches performed by the account;

- All information about the user's access and use of Facebook Marketplace;

• The length of service (including start date), the types of service utilized by the user, and the means and source of any payments associated with the service (including any credit card or bank account number);

• All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

• All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken;

• All cookie data and associate machines and accounts collected by Facebook for user's account to include, but not limited to, browser information if available and other pages and groups where the user (or the associated user) is the creator.

Law enforcement personnel will thereafter review all information and records received from Facebook, Inc. employees to determine the information to be seized by law enforcement personnel. The information to be seized consists of information that constitutes evidence of violations of 7 U.S.C. § 2156 and 18 U.S.C. §§ 49(a) and 371, and/or relates to dog-fighting ventures; individuals or groups who engage in, sponsor, or attend dog fights; individuals or groups who breed dogs for the purpose of dog-fighting; and/or the identity of the person(s) who created and/or used the account.